# GIN THE COURT OF CRIMINAL APPEALS OF TENNESSEE AT JACKSON
## Assigned on Briefs March 3, 2020

## ANTHONY THOMPSON v. STATE OF TENNESSEE

### Appeal from the Criminal Court for Shelby County
### No. 14-03467    J. Robert Carter, Jr., Judge

---

### No. W2019-01206-CCA-R3-PC

---

The petitioner, Anthony Thompson, appeals the denial of his petition for post-conviction relief, which petition challenged his conviction of first degree murder, alleging that he was deprived of the effective assistance of counsel. Discerning no error, we affirm the denial of post-conviction relief.

### Tenn. R. App. P. 3; Judgment of the Criminal Court Affirmed

JAMES CURWOOD WITT, JR., J., delivered the opinion of the court, in which TIMOTHY L. EASTER, and J. ROSS DYER, JJ., joined.

Joshua N. Corman, Memphis, Tennessee, for the appellant, Anthony Thompson.

Herbert H. Slatery III, Attorney General and Reporter; Courtney N. Orr, Assistant Attorney General; Amy P. Weirich, District Attorney General; and Scott Smith, Assistant District Attorney General, for the appellee, State of Tennessee.

### OPINION

A Shelby County Criminal Court jury convicted the petitioner of one count of first degree premeditated murder stemming from the shooting death of Barris Jones. *State v. Anthony Thompson*, No. W2016-00077-CCA-R3-CD, slip op. at 1 (Tenn. Crim. App., Jackson, Mar. 9, 2017). This court summarized the evidence on direct appeal:

> [T]he [petitioner] stood over the victim, who was unconscious from a blow to the head, and shot him eleven times. Marquitta Covington identified the [petitioner] as the one who shot the victim numerous times. Co-defendant Keron Cowan testified that he was one of the three men at the scene, that he was the first to strike the victim, who was then hit

with a pistol in the back of the head by "Twin," and that he was ordered at gunpoint by the [petitioner] to move out of the way. As he did so, he heard numerous gunshots. Further, the victim, in a dying declaration, uttered the [petitioner's] name in response to Officer [Keith] Holden's question, "What happened? Who's responsible for this[?]" The testimony of Mr. Cowan was corroborated by that of Ms. Covington and Mr. [Lemarcus] Rhodes who said he saw the victim being attacked by three men, whom he could not identify, two of whom had pistols.

*Id.*, slip op. at 12-13 (seventh alteration in original). Upon the petitioner's conviction, the trial court imposed a life sentence. *Id.*, slip op. at 1. This court affirmed the conviction on direct appeal, *id.*, slip op. at 13, and our supreme court denied review, *State v. Anthony Thompson*, No. W2016-00077-SC-R11-CD (Tenn., Jackson, July 20, 2017) (Order).

The petitioner filed a timely pro se petition for post-conviction relief, and, after the appointment of counsel, he filed an amended petition, alleging the ineffective assistance of the petitioner's trial counsel. Specifically, the petitioner alleged that trial counsel performed deficiently by failing to argue against the victim's statement of identification being admitted as a dying declaration on the ground that the victim was unconscious at the time that he was shot and by failing to present alibi witnesses at trial.

At the May 2019 evidentiary hearing, trial counsel testified that he received discovery materials from the State in preparation for trial, which materials included the transcript of a preliminary hearing. Marquitta Covington testified at that hearing that the victim was unconscious at the time that he was shot. Before trial, counsel moved to exclude the victim's identification of the defendant as the shooter, arguing that the statement did not qualify as a dying declaration because the victim did not believe that his death was imminent. Counsel acknowledged that he did not challenge the statement's admissibility on the ground that the victim was unconscious and, therefore, unable to identify the shooter, but he stated that because most of the elements of a dying declaration "were pretty obviously satisfied," he "challenged the one that -- appeared to be the least likely to be -- to allow the statement to be admissible."

Trial counsel testified that he impeached several of the State's witnesses with inconsistent statements regarding the shooter's identity. For example, at the preliminary hearing, Ms. Covington had identified the shooter as one of the co-defendants, but at trial, she identified the petitioner as the shooter. Similarly, at the preliminary hearing, Lemarcus Rhodes testified that "[t]he fat guy did the shooting," but

at trial he stated that he did not know who had fired the shots. According to trial counsel, Mr. Rhodes's description of the shooter as "fat" pointed to one of the co-defendants, who "was a big guy," as the shooter.

Trial counsel stated that he explored using an alibi defense, speaking with several of the petitioner's family members who would testify that the petitioner had been in Mississippi at the time of the murder. He described his primary defense strategy as emphasizing the "identification issues as far as who the shooter was," and, after discussing the issue with the petitioner, he chose not to present alibi witnesses at trial. Because trial counsel "felt like there had been quite a bit of proof established that [the petitioner] was present at the scene, but there were questions about whether or not he was the shooter," counsel was "concern[ed] about putting on alibi witnesses to say [the petitioner] was in another state when we had other people testify that he was there, I was afraid it would blow up in our face."

During cross-examination, trial counsel stated that in arguing to exclude the victim's statement of identification, he focused on the condition of the victim, emphasizing that the victim had survived for several hours after officers arrived at the scene. Although he could not recall his specific thought process in preparing his argument, trial counsel said that he was "sure [he] had" considered arguing that the victim was unconscious at the time of the shooting but decided against it. He had thought that the question of the victim's consciousness was more of an issue to argue before the jury.

Trial counsel stated that all of the potential alibi witnesses were the petitioner's family members. He elaborated on his concern about calling alibi witnesses:

> There had been numerous witnesses that were put on that had
> identified [the petitioner] at least as having been at the scene
> of the crime. I was afraid by putting up family members just
> to say that he was [in] another state, that the jurors would take
> it we're trying to pull one over on them.

He decided against calling those witnesses to avoid that risk.

Bessie Henderson, who was the mother of the petitioner's girlfriend, testified that she had spoken with trial counsel approximately three times prior to trial and that she was present in Memphis and available to testify at trial. She stated that, at the time of the shooting, she was at 1239 Boone Drive in Utica, Mississippi, where she was celebrating Memorial Day with her family, including the petitioner. She arrived at the

gathering around noon and stayed until approximately 6:30 p.m. or 7:00 p.m. At that time, the petitioner was dating Ms. Henderson's daughter, and they both lived with Ms. Henderson. Ms. Henderson recalled that the petitioner left the family gathering "right behind me," stating that she remembered this detail because "when I go in my house I lock my door. That's it. If you not in there you can't get in." She said that Utica was 198 miles outside of Memphis, which she estimated was a three to four-hour drive. She stated that she would have given this same testimony had she been called as a witness at trial. On cross-examination, she stated that she told trial counsel that the petitioner was with her at the family gathering at the time of the shooting.

Shavonnah Knight, who was the sister of the petitioner's girlfriend, testified that she was prepared to testify at the petitioner's trial that the petitioner was "in Utica at the family gathering" on the day of the shooting. She recalled the events of that day: "Well, [the petitioner] was at my grandma's house, and we was having a barbecue. . . . [H]e was playing ball with my cousin and them. And then they went to play dominoes . . . . And then around -- I'd say around 7:00 we all went home . . . ." She specifically recalled the petitioner's being at the barbecue "because I stayed with my mom when he was staying with us as well, him and my sister. So we was all basically together. So we basically came to the gathering and left to the gathering the same."

On cross-examination, she stated that she considered the petitioner to be her brother-in-law. She had spoken to trial counsel before trial and told him that the petitioner was present with her in Utica at the time of the shooting.

Jessica Knight, the petitioner's girlfriend, testified that she had spoken with trial counsel in the time leading up to the petitioner's trial, discussing the petitioner's alibi. She stated that she was prepared to testify during the petitioner's trial, but "[w]e actually got a phone call like the last day saying the case was going in his favor so there was no need for us to testify." She recalled that the day of the shooting was Memorial Day, and "[w]e was just at my grandmother's house, just playing basketball, playing dominoes, and I remember [the petitioner] got mad because he couldn't shoot his fireworks, because it was still light outside. So he just threw a fit basically and went inside the house." At that time, she and the petitioner were living with her mother in Utica. She estimated that she and the petitioner arrived at her grandmother's house at approximately 12:30 p.m. or 1:00 p.m. that day and left around 6:00 p.m. She estimated that Utica was a three-hour drive from Memphis.

On cross-examination, she stated that her conversations with trial counsel were by telephone. She spoke to trial counsel alone and was the first of the family members to speak with him. Counsel then followed up with other family members.

Upon questioning by the court, she acknowledged that she did not contact police to notify them that they had the wrong suspect. She was present with the petitioner at the time of his arrest, however, and she tried to tell the police they had the wrong person at that time, but "[t]hey didn't want to hear nothing we had to say."

Jessie Jones, the grandmother of Jessica Knight, stated that she tried to speak with trial counsel about the petitioner's alibi, "but he didn't -- he didn't talk to me about that." She stated that she was prepared to testify at the petitioner's trial and that, had she been called, she would have testified that on May 26, 2014, the petitioner "was at my house. I always cook a dinner on Sunday's and he -- everybody from my children all -- grandchildren, all be at my house every Sunday." She stated that the family was also at her house on Memorial Day. She estimated that the petitioner arrived at her house around noon that day and stayed until approximately 8:00 p.m. or 9:00 p.m.

During cross-examination, Ms. Jones explained that on the weekend of the shooting, she cooked for the family on both Sunday and Monday for the Memorial Day holiday. She specifically recalled the petitioner's being present at her house that day because "they was playing ball, and we was out there on the porch." When asked if she had told the police that the petitioner was present at the family gathering at the time of the shooting, she replied, "They didn't have no trial that I remember. They didn't ask nobody about nothing." She reiterated that trial counsel was "supposed to have talked to us, but he wouldn't -- he didn't talk to us."

At the close of the evidence, the post-conviction court took the matter under advisement. In its written order denying post-conviction relief, the court found that trial counsel's defense strategy "was one of trying to rely upon the State's inability to prove that [the] petitioner was responsible." The court concluded that counsel's decisions were tactical in nature and "were based on adequate preparation," and, consequently, the petitioner was not entitled to post-conviction relief.

In this timely appeal, the petitioner reasserts his arguments that trial counsel performed deficiently by failing to argue that the victim's statement of identification should have been excluded on the ground that the victim was unconscious at the time of the shooting and by failing to call alibi witnesses.

We view the petitioner's claim with a few well-settled principles in mind. Post-conviction relief is available only "when the conviction or sentence is void or voidable because of the abridgment of any right guaranteed by the Constitution of Tennessee or the Constitution of the United States." T.C.A. § 40-30-103. A post-

conviction petitioner bears the burden of proving his or her factual allegations by clear and convincing evidence. *Id.* § 40-30-110(f). On appeal, the appellate court accords to the post-conviction court's findings of fact the weight of a jury verdict, and these findings are conclusive on appeal unless the evidence preponderates against them. *Henley v. State*, 960 S.W.2d 572, 578-79 (Tenn. 1997); *Bates v. State*, 973 S.W.2d 615, 631 (Tenn. Crim. App. 1997). By contrast, the post-conviction court's conclusions of law receive no deference or presumption of correctness on appeal. *Fields v. State*, 40 S.W.3d 450, 453 (Tenn. 2001).

Before a petitioner will be granted post-conviction relief based upon a claim of ineffective assistance of counsel, the record must affirmatively establish, via facts clearly and convincingly established by the petitioner, that "the advice given, or the services rendered by the attorney, are [not] within the range of competence demanded of attorneys in criminal cases," *see Baxter v. Rose*, 523 S.W.2d 930, 936 (Tenn. 1975), and that counsel's deficient performance "actually had an adverse effect on the defense," *Strickland v. Washington*, 466 U.S. 668, 693 (1984). In other words, the petitioner "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* at 694. Should the petitioner fail to establish either deficient performance or prejudice, he is not entitled to relief. *Id.* at 697; *Goad v. State*, 938 S.W.2d 363, 370 (Tenn. 1996). Indeed, "[i]f it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, . . . that course should be followed." *Strickland*, 466 U.S. at 697.

When considering a claim of ineffective assistance of counsel, a reviewing court "begins with the strong presumption that counsel provided adequate assistance and used reasonable professional judgment to make all significant decisions," *Kendrick v. State*, 454 S.W.3d 450, 458 (Tenn. 2015) (citation omitted), and "[t]he petitioner bears the burden of overcoming this presumption," *id.* (citations omitted). We will not grant the petitioner the benefit of hindsight, second-guess a reasonably based trial strategy, or provide relief on the basis of a sound, but unsuccessful, tactical decision made during the course of the proceedings. *Adkins v. State*, 911 S.W.2d 334, 347 (Tenn. Crim. App. 1994). Such deference to the tactical decisions of counsel, however, applies only if the choices are made after adequate preparation for the case. *Cooper v. State*, 847 S.W.2d 521, 528 (Tenn. Crim. App. 1992).

Here, the record supports the post-conviction court's conclusion that trial counsel's decisions were tactical. Trial counsel testified that he chose to argue for the exclusion of the victim's statement on the ground that the victim did not believe his death was imminent because he determined that to be the strongest argument for exclusion.

-6-

Counsel also testified that he chose not to call alibi witnesses out of concern that the alibi was contradicted by eyewitnesses and that, because all of the alibi witnesses were family members, the jury would not find them credible. Counsel's uncontroverted testimony established that these decisions were strategic ones, and we will not now second-guess that strategy. *See Adkins*, 911 S.W.2d at 347.

Accordingly, the judgment of the post-conviction court is affirmed.

_____
JAMES CURWOOD WITT, JR., JUDGE